# IN THE COURT OF APPEALS OF IOWA

No. 13-0852
Filed May 29, 2014

**TANYA POTTENGER,**
        Plaintiff-Appellant,

**vs.**

**PAUL NIEVES, D.O., and**
**NEWTON CLINIC, P.C.,**
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Jasper County, Brad McCall, Judge.


        A plaintiff appeals from adverse judgment following a jury trial on medical negligence claims. **AFFIRMED.**


        Martin Diaz of Martin Diaz Law Firm, Iowa City, for appellant.

        John D. Hilmes of Finley, Alt, Smith, Scharnberg & Craig, Des Moines, for appellees.


        Heard by Doyle, P.J., and Mullins, J., and Mahan, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2013).

**MULLINS, J.**

Tanya Pottenger appeals from judgment following a jury trial denying her medical malpractice claim against Paul Nieves. She alleges Nieves, her obstetrician and gynecologist, was negligent in his care of her and asserts this led to her developing cervical cancer. Nieves argues Pottenger was also negligent in failing to obtain the follow-up care he recommended. On appeal, Pottenger contends the jury's verdicts are inconsistent and the jury's finding of her comparative fault lacks substantial evidence. We affirm.

## I.      BACKGROUND FACTS AND PROCEEDINGS.

Nieves was an osteopathic doctor of obstetrics and gynecology practicing at the Newton Clinic in Newton, Iowa. He provided obstetrical and gynecological care to Pottenger through two pregnancies. In September 2002, while Pottenger was several months pregnant, Nieves performed a Pap test on her. A Pap test is a screening test for abnormal cell development of the cervix, also called dysplasia. To perform the test, the doctor exposes the cervix using a speculum and scrapes cells from its surface, placing them on a slide or in a solution for analysis. Doctors typically recommend patients undergo yearly Pap screening to test for problems that could lead to cervical cancer. Cervical cancer, a malignant tumor on the cervix, is a slow-developing cancer. Thus, yearly testing is an effective method of screening for women with no prior history of abnormal tests.

Pottenger's September 2002 Pap test showed dysplasia on her cervix. On the laboratory report, Nieves handwrote a short note indicating that Pottenger would need an additional follow-up test called a colposcopy. A colposcopy is a

diagnostic test where the doctor attempts to visualize abnormal cell development on the cervix. This allows the doctor to determine the extent of the dysplasia and its location. To perform the colposcopy, the doctor exposes the cervix and applies light and a magnifier to the area. The doctor then applies a chemical solution that helps the doctor visualize any lesions, tumors, or other abnormalities on the cervix. If the doctor identifies abnormalities, the doctor can take a tissue sample, or biopsy, to diagnose the nature of the cells and determine if the abnormality is precancerous or cancerous. After the first Pap test Nieves performed, Pottenger gave birth in December 2002. Following the birth, Pottenger did not make contact with Nieves for additional care until May of 2003.

On May 1, 2003, Pottenger was pregnant again and attended an obstetrical appointment with Nieves. At the appointment, Nieves performed a second Pap test. The results again showed dysplasia of the cervix. On May 8, Nieves sent a letter to Pottenger asking her to schedule a colposcopy to examine the abnormality within four weeks. Nieves saw Pottenger again on May 29 for another obstetrical checkup. Nieves testified he again recommended that Pottenger undergo a colposcopy. Pottenger scheduled this procedure for June 16.

During the colposcopy, Nieves took two biopsies of areas of Pottenger's cervix he identified visually as abnormal. Testing of the first biopsy revealed mild dysplasia. Testing of the second biopsy revealed severe dysplasia that Nieves described as "precancerous," meaning it might become cancerous. Nieves and the other experts in the case testified the next step in treatment for a non-

pregnant gynecological patient would have been an "excisional procedure" designed to remove the dangerous tissue from the cervix by cutting it out (in the case of a cone procedure) or by burning while cutting it out (in the case of a loop excision procedure or LEEP.) The purpose and goal of an excisional procedure is to contain the spread of dysplasia and thereby prevent the cells from developing into cancer.

However, due to Pottenger's pregnancy, Nieves could not perform any excisional procedure. Nieves and the other experts in the case testified that passing items such as medical instruments into the cervical canal or cutting out tissues within the cervical canal during pregnancy increases the risk of hemorrhage, infection, and pre-term labor. Doctors avoid such procedures during the patient's pregnancy as much as possible. Instead, Nieves recommended regular Pap tests during Pottenger's pregnancy to determine the progression of the abnormality. Another Pap test, conducted October 13, showed another abnormal result. Nieves determined Pottenger would require an excisional procedure called a "cold knife cone" after she delivered her baby.

Pottenger delivered her baby in early November 2003.[1] Nieves did not perform the cold knife cone procedure at that time. On December 19, 2003, Pottenger returned for a six-week postnatal checkup, and Nieves performed another Pap test. This Pap test returned with a normal result. Nieves testified he still advised Pottenger at the December 19 appointment that she would need to schedule an appointment for a colposcopy within thirty days. However, Nieve's

---

[1] Following the delivery Pottenger requested, and Nieves performed a tubal ligation.

practice also generated a standard letter for normal Pap test results informing Pottenger there was no abnormality and that she did not need to take any further action at that time. In a postscript to the letter, which Nieves inserted personally, he stated:

> Please repeat pap in six months. This is warranted due to your high grade [severe] dysplasia. We would like to re-evaluate this even though the findings were good during this screening interval. We would like to see a repeat at that time. If it is once again normal, you should return [to] yearly screening.

Also at the December 19, 2003, appointment, Pottenger informed Nieves she planned to move to Des Moines. Nieves testified he advised Pottenger that she should either obtain a new medical care provider in Des Moines and proceed with follow-up care there, or continue to receive care from him. Nieves testified that at the conclusion of this appointment, he "left the door open" for Pottenger to continue her care with him. However, this appointment was Nieves' last contact with Pottenger.

Pottenger moved to Des Moines in early 2004 and did not obtain another Pap test at the recommended six months. In September 2005, Pottenger was diagnosed with cervical cancer, which spread to her lymph nodes, caused a number of medical complications, and required her to undergo a radical hysterectomy.

Pottenger brought suit against Nieves alleging he negligently failed to diagnose and treat her condition in a timely manner and failed to follow up and monitor her after the December 19, 2003 appointment. Nieves argued at trial that Pottenger was also negligent in failing to follow-up with his recommendations

for her continuing care and bore a greater proportion of the fault in ultimately developing cervical cancer. Following the presentation of evidence, the district court instructed the jury on comparative fault, including informing them that assigning Pottenger more than fifty percent of the fault would result in her not recovering damages. The verdict was in the form of special interrogatories requiring the jury to answer five questions:

1. Was Defendant Paul Nieves negligent in the care and treatment of the Plaintiff, Tanya Pottenger?
2. Was the negligence of Defendant Paul Nieves a cause of any item of damage to Plaintiff Tanya Pottenger?
3. Was the Plaintiff Tanya Pottenger negligent for failing to obtain follow-up care?
4. Was the negligence of Plaintiff Tanya Pottenger a cause of any item of damage to Plaintiff?
5. Using 100% as the total combined fault of Plaintiff Tanya Pottenger and Defendant Paul Nieves which was a cause of Plaintiff Tanya Pottenger's damage, what percentage of such combined fault do you assign to the Plaintiff Tanya Pottenger and what percentage of such combined fault do you assign to the Defendant Paul Nieves?

The jury found Nieves was negligent in his care of Pottenger. It also found Pottenger was negligent in failing to obtain follow-up care. It assigned Pottenger fifty-one percent of the fault and Nieves forty-nine percent. Accordingly, the district court entered judgment dismissing Pottenger's claim.

Pottenger filed a combined motion for judgment notwithstanding the verdict and new trial. She argued the jury could only have found Nieves negligent by failing to advise Pottenger of the need for follow-up care. This, she alleged, was inconsistent with the second finding, that Pottenger failed to obtain follow-up care, because Pottenger could not fail to do something Nieves did not advise her to do. She also argued the jury's finding that she was also at fault

was against the weight of the evidence. She further raised several statutory and constitutional arguments against the jury instructions. The district court declined to address the statutory and constitutional arguments as untimely. It did however address and reject Pottenger's arguments on the jury's findings and denied the motions. Pottenger appeals.

## II. ANALYSIS.

### A. Consistency of the Verdicts.

#### 1. Error Preservation.

Nieves contends Pottenger failed to preserve error on her first claim, that the verdicts are inconsistent. Iowa Rule of Civil Procedure 1.924 provides that at the close of evidence but before jury arguments, parties may make objections to jury instructions.

> Within such time, all objections to giving or failing to give any instruction must be made in writing or dictated into the record, out of the jury's presence, specifying the matter objected to and on what grounds. No other grounds or objections shall be asserted thereafter, or considered on appeal.

Iowa R. Civ. P. 1.924.

Pottenger did raise a timely objection to the comparative fault instruction at the close of evidence. She moved for directed verdict on that claim based on the argument that "there [was] insufficient evidence to submit the comparative fault defense." The court denied this motion. In her motion for judgment notwithstanding the verdict and new trial, Pottenger asserted, "[B]ecause Dr. Nieves could not have been found negligent unless the jury found that Dr. Nieves failed to advise Plaintiff that a colposcopy was needed on or shortly after

December of 2003, the jury's verdict that Plaintiff was herself negligent for failing to follow advice not given was inherently inconsistent." Nieves argues Pottenger should have raised this issue during discussion of the jury instructions following the presentation of evidence at trial. Because this is an argument about the factual determinations of the jury, rather than the jury instructions, we will address this issue on appeal.

### 2. Standard of Review.

We review a district court's determination of whether two verdicts are inconsistent for correction of errors at law. *Clinton Physical Therapy Serv. V. John Deere Health Care*, Inc., 714 N.W.2d 603, 609 (Iowa 2006).

### 3. Merits.

Pottenger contends the verdicts are inconsistent because she could not be at fault for failing to obtain follow-up care if the jury also found Nieves failed to advise her adequately of the need for follow-up care. When deciding whether a jury's verdicts are inconsistent, we construe the verdicts liberally to give effect to the jury's intention and harmonize the jury's answers if possible. *Pavone v. Kirke*, 801 N.W.2d 477, 498 (Iowa 2011) (citing to *Hoffman v. Nat'l Medical Enters., Inc.*, 442 N.W.2d 123 (Iowa 1989)). The test is whether the verdicts can be reconciled in any reasonable manner consistent with the evidence and its fair inferences, and in light of the instructions of the court. *Kalvik ex rel. Kalvik v. Seidl*, 595 N.W.2d 136, 139 (Iowa Ct. App. 1999).

The jury received the following instructions:

Instruction No. 12

In order to recover from the Defendant, the Plaintiff must prove all of the following propositions:

1. Defendant was negligent in providing medical care to Plaintiff:
   a. by not performing appropriate diagnostic testing (colposcopy) on Plaintiff on or shortly after December 19, 2003, or
   b. by failing to properly notify Plaintiff of the need for follow-up care.

. . . .

Instruction No. 14

To prevail on his claim that Plaintiff was negligent, Defendant must prove both of the following:

1. The Plaintiff was negligent in failing to obtain follow-up care as recommended by Defendant;
2. The negligence of the Plaintiff was a cause of damages to the Plaintiff[.]

If Defendant has proved both of these propositions, the Defendant has proved this defense, and you shall assign a percentage of fault to Plaintiff. If Defendant has failed to prove one or both of these propositions, then Defendant has not proved Plaintiff was negligent.

Pottenger's argument that the verdicts were inconsistent is premised on her assertion that "Nieves could not have been found negligent unless the jury found that Dr. Nieves failed to advise the Plaintiff that a colposcopy was needed on or shortly after December of 2003[.]" However, Instruction No. 12 clearly states the jury could find Nieves was negligent *either* by failing to perform the colposcopy in December 2013 *or* by failing to advise Pottenger of the need for follow-up care.

Our longstanding case law provides that if the verdicts can be reconciled in any reasonable manner, we will not find them inconsistent. Nothing in the record discloses on which ground the jury found Nieves negligent—the jury verdict form simply asks, "Was Defendant Paul Nieves negligent in the care and treatment of the plaintiff, Tanya Pottenger?" The handwritten response was

"yes." If the jury found that Nieves was negligent because he failed to perform the colposcopy in December 2013 but that he did adequately advise Pottenger of the need for follow-up care, it could also find that Pottenger was negligent in failing to follow the advice she was given. Under that scenario, there is no logical inconsistency with the comparative fault instruction. Given that this is a reasonable manner in which to reconcile the two verdicts, we do not find the verdicts are inconsistent.

Next, we address Pottenger's second claim that the jury's finding of her comparative fault was not supported by substantial evidence.

**B.      Sufficiency of the Evidence Supporting the Jury's Finding of Pottenger's Fault.**

**1.      Standard of Review.**

"Jury findings of fact are binding on appeal if they are supported by substantial evidence." *Shams v. Carney*, 518 N.W.2d 366, 368-69 (Iowa 1994). "Evidence is substantial if reasonable minds would find it adequate to reach the same conclusion, even if we might draw a contrary inference." *Id.* at 369. "We view the evidence in the light most favorable to the party in whose favor the verdict was rendered." *Id.*

**2.      Merits.**

Pottenger contends there was insufficient evidence supporting the jury's finding she was negligent. At trial, Nieves and Pottenger both testified, as well as several expert witnesses. Nieves testified about general aspects of gynecological treatment and about his treatment of Pottenger specifically. He

testified that the Pap test is a screening test that does not indicate that there are precancerous cells, only that there may be an abnormality that requires further testing through a colposcopy. For gynecological patients who are not pregnant and who display severe dysplasia, the next step in treatment is to remove the abnormal tissue through an excisional procedure. This step prevents the further spread and development of abnormal cells that lead to cancer. Nieves further testified that among patients who are pregnant and who display dysplasia, it is common for a postpartum Pap test to show a negative result for abnormal cells, a phenomenon called regression. Regression is caused by the shedding of cells of the cervix during vaginal delivery resulting in the absence of measurable dysplasia after birth. Nieves testified this is one explanation for why Pottenger's postpartum Pap test in December 2003 gave a negative result.

Following Pottenger's colposcopy in June 2003 and in light of the results of mild and severe dysplasia, Nieves testified that if Pottenger had not been pregnant that summer and fall, he would have proceeded with the next steps of diagnosis and treatment. Instead he planned to have Pottenger take a Pap test every eight weeks through her pregnancy to monitor the progress of the dysplasia. He also planned to perform an excisional procedure after she delivered the baby. He testified that, following the October 2013 Pap test, he discussed with Pottenger the need to do the excisional procedure "in the postpartum time frame at the six-week checkup." Pottenger delivered in early November and appeared for a six-week checkup on December 19, 2003,

however, Nieves performed another Pap test and did not perform the cold knife procedure.

At trial he explained he intended to give Pottenger another Pap test at the six-week checkup and later perform another colposcopy to locate the lesions in preparation for the excisional procedure that would remove them. He further stated the excisional procedure is an outpatient procedure requiring general anesthetic that must be scheduled in advance. Therefore he could not perform it at the six-week checkup on December 19, 2003. He also stated the proper time-frame in which to perform an excisional procedure following birth is eight to twelve weeks.[2] He testified that therefore, on December 19, he asked Pottenger to schedule a colposcopy within thirty days.

He further testified although the December 19th Pap test came back negative, it could have been caused by regression and he nonetheless intended for Pottenger to undergo the colposcopy within thirty days. He admitted that his instruction that Pottenger schedule a new colposcopy appointment was not documented in his notes for the appointment,[3] nor was it included in the standard

---

[2] He testified this interval gives the cervix time to heal and the effects of regression to recede.

[3] Nieve's notes for the appointment state:

> Here for postpartum examination. The baby is doing well. Bottle feeding at this point. No bowel or bladder problems. She had a tubal ligation. She is also concerned about some post-partum depression. Family member with her today also reported that she is not eating well, feeling tired all the time, nonfunctional, history of depression. We will start her on Zoloft. A patient starter kit was given. *We will see her again in 30 days.* She is to contact me in two weeks if she is having any further difficulty. Bimanual exam and sterile speculum exam were completed. All were well within normal limits. We repeated a Pap today as she has a history of high-grade squamous intraepithelial lesion of the cervix. If this is

letter he sent to Pottenger. He also admitted the standard letter stated the December 19th Pap test indicated there was no abnormality and that there was no further need for screening at that time. He stated, however, that he amended the letter specifically to instruct Pottenger to seek another Pap test in six months, based on her history of abnormality.

When Pottenger informed Nieves she was moving to Des Moines, he testified he gave her two options: either to schedule the colposcopy with him or find a new medical provider in Des Moines. He testified he told Pottenger she "absolutely need[ed] to follow up with a new medical provider" and to "not let this fall through the cracks."

Dr. Peter Morris, a gynecological oncologist, testified on behalf of Nieves. He testified that, given a similar patient, he too would have declined to do a colposcopy at the December 19 appointment and asked the patient to get another Pap test in six months. He testified that giving a Pap test six weeks postpartum was adequate and appropriate under the circumstances. This is because childbirth causes trauma to the cervix, causing the cells to "slough off"; the cervix needs to heal before abnormal cell development can be identified. According to Morris, a colposcopy so soon after birth would not detect abnormalities, especially when a Pap test at that time revealed no abnormal cell development. He testified he would have waited for the cervix to heal and possibly develop detectable abnormalities again before proceeding to a

---

consistent, we will proceed with cold knife conization at the earliest appointment time.

(Emphasis added.) At trial, Pottenger argued the "30 days" notation referenced the Zoloft. Nieves testified it referenced her returning in thirty days for the colposcopy.

colposcopy. He further testified that although doing a colposcopy at six weeks was medically sound, it was "maybe doing too much" nonetheless, it was "not a breach of care." He also stated six months after delivery is an appropriate time to reevaluate the patient for cell development and a Pap test was an appropriate way to do so. Therefore, in his experience with detecting cervical cancer, instructing the patient to repeat a Pap in six months was not inappropriate. Morris also testified that, because the Pap test is highly effective at detecting precancerous conditions at an early stage, had Pottenger obtained a new Pap test at six months, it would have changed her medical outcome.[4]

Dr. Robert Burger, a gynecological oncologist, testified as Pottenger's expert witness. He stated he would have performed colposcopies throughout Pottenger's pregnancy to determine visually if there was any progression in the lesions. He also opined that it was inappropriate to do another Pap test at the December 19th appointment. He testified Pottenger should have had a colposcopy with a biopsy either that day or within a few weeks. To Burger, it made "no sense" to continue performing the Pap, which is a screening test, on a patient who has already demonstrated abnormal tests. After screening, Nieves should have proceeded to diagnosis with a colposcopy and biopsy. Therefore, he considered Nieve's failure to perform a colposcopy during the December 19th appointment or shortly thereafter a breach in the standard of care for patients like

---

[4] Dr. Steven Keller, an obstetrician and gynecologist, also testified for Nieves. Keller stated Nieves did an excellent job caring for Pottenger. He also stated he would have treated Pottenger in exactly the same way Nieves did.

Pottenger.  He also testified that six weeks postpartum was an appropriate time to perform a colposcopy according to national guidelines.

Pottenger testified she was aware of the diagnosis of dysplasia in 2003 and was concerned about it.  After she moved to Des Moines in early 2004, she did not seek follow-up care as Nieves recommended.  Her medical records disclose the next time she had a colposcopy was in March 2005 when she reported to an emergency room in Des Moines complaining of abdominal pain. The medical records also state Pottenger informed the physician she had been found to have cervical dysplasia in the past and was advised to obtain follow-up care "but ha[d] not been able to afford health care."  Pottenger received a diagnosis of cervical cancer in September 2005.

The jury's instructions stated, "To prevail on his claim that [Pottenger] was negligent, [Nieves] must prove both of the following: 1. [Pottenger] was negligent in failing to obtain follow-up care as recommended by [Nieves]; 2. The negligence of [Pottenger] was a cause of damages to [Pottenger]."  The instructions also provided the following definition of negligence:

> "Negligence" means failure to use ordinary care.  Ordinary care is the care which a reasonably careful person would use under similar circumstances.  "Negligence" is doing something a reasonably careful person would not do under similar circumstances, or failing to do something a reasonably careful person would do under similar circumstances.

Although Nieve's instruction to schedule a colposcopy was not in his notes for the December 19th appointment nor in the form letter he sent to Pottenger, Nieves had been discussing the need for follow-up care with Pottenger since her first abnormal Pap test.  Nieves also testified he instructed Pottenger to schedule

the colposcopy within thirty days at the December 19th appointment. Nieve's postscript to the standard letter is clear that repeating a Pap test in six months was necessary because of Pottenger's previous abnormal tests and that she would need to be re-evaluated in six months despite the normal result from the December 19th test. Nieves also emphasized at her last appointment with him the importance of obtaining follow-up care if she left the area and moved to Des Moines. Pottenger herself testified she was aware of the diagnosis and that she was concerned about it. Despite that knowledge, she did not obtain a Pap test at six months or pursue any other appropriate follow-up care. She did not obtain a colposcopy until March 2005, more than a year after she had last seen Nieves. The medical records from March 2005 show she was still aware of the earlier diagnosis and admitted she had not sought follow-up care. Morris testified if she had obtained a six month pap, her outcome would have been different because the Pap test is such an effective screening mechanism for detecting precancerous conditions at an early stage. This was sufficient evidence upon which the jury could conclude a Pap test at six months would have increased the likelihood of a better outcome for Pottenger. Reasonable jurors also could find the evidence in the record adequate to conclude that Pottenger did not exercise the care that a reasonably careful person would use under similar circumstances and that this was a cause of her damages. Therefore, we affirm the jury verdict finding Pottenger negligent.

**III.    CONCLUSION.**

Because we find the verdicts in this case can be reconciled in a reasonable manner consistent with the evidence, we find Pottenger's argument that the jury verdicts were inconsistent to be without merit.  We further find there is substantial evidence supporting the jury's finding that Pottenger was negligent in failing to obtain follow-up care that would have prevented her development of cervical cancer.  Accordingly, we affirm the district court's denial of her motion for new trial and judgment notwithstanding the verdict, and the judgment dismissing her claim.

**AFFIRMED.**